UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

JEANNETTE L. WHITEHEAD,        )
                               )
                Plaintiff,     )
                               )
        v.                     )    No.  4:10CV1066 FRB
                               )
MICHAEL J. ASTRUE,             )
Commissioner of Social Security, )
                               )
                Defendant.     )

**MEMORANDUM AND ORDER**

This cause is before the Court on plaintiff's appeal of an adverse ruling of the Social Security Administration. All matters are pending before the undersigned United States Magistrate Judge, with consent of the parties, pursuant to 28 U.S.C. § 636(c).

## I.  Procedural History

On May 3, 2007, plaintiff Jeannette L. Whitehead filed an application for Disability Insurance Benefits (DIB) pursuant to Title II of the Social Security Act, 42 U.S.C. §§ 401, et seq., and an application for Supplemental Security Income (SSI) pursuant to Title XVI of the Act, 42 U.S.C. §§ 1381, et seq., in which she alleged that she became disabled on September 15, 2006. (Tr. 149-51, 157-60.)  On initial consideration, the Social Security Administration denied plaintiff's claims for benefits. (Tr. 55, 56, 58-62.)  On August 12, 2009, upon plaintiff's request, a hearing was held before an Administrative Law Judge (ALJ). Plaintiff testified and was represented by counsel. A vocational

expert also testified at the hearing.  (Tr. 20-38.)[1]  On September
22, 2009, the ALJ issued a decision denying plaintiff's claims for
benefits.  (Tr. 8-19.)  On April 16, 2010, after consideration of
additional evidence, the Appeals Council denied plaintiff's request
for  review  of  the  ALJ's  decision.   (Tr. 1-4.)   The  ALJ's
determination  thus  stands  as  the  final  decision  of  the
Commissioner.  42 U.S.C. § 405(g).

## II.  Evidence Before the ALJ

A.   <u>Plaintiff's Testimony</u>

     At the hearing on August 12, 2009, plaintiff testified in
response to questions posed by the ALJ and counsel.  At the time of
the  hearing,  plaintiff  was  forty-one  years  of  age.   (Tr. 24.)
Plaintiff  is  not  married.   (Tr. 27.)   Plaintiff  lives  with  her
mother,  her  mother's  husband,  her  brother,  and  her  four  children
who  are  seventeen,  sixteen,  ten,  and  nine  years  of  age.   Plaintiff
completed twelve years of school and has one year of college.  (Tr.
25.)

     From  1990  to  1995,  plaintiff  worked  in  the  research/
marketing  field  performing  data  entry  work.   From  October  1995  to
December  2006,  plaintiff  worked  as  a  processor  in  a  medical
laboratory.   (Tr. 209.)   Plaintiff  testified  that  she  tried  to
return  to  work  in  2007  but  that  her  worsening  physical  condition

---

[1]The hearing was originally scheduled for March 31, 2009.  The
ALJ  continued  the  hearing,  however,  to  provide  plaintiff  an
opportunity to secure legal representation.  (Tr. 40-54.)

prevented her from doing so.   (Tr. 25-26.)

Plaintiff testified that she is unable to work because of lupus, which causes swelling and pain in her legs, feet, hands, and arms.  Plaintiff testified that she is in a lot of pain all of the time.  Plaintiff testified that her medication for the condition consists of a series of injections administered periodically. Plaintiff testified that she does not feel as though the medication helps her lupus symptoms.  Plaintiff also testified that she was recently hospitalized for the condition.  (Tr. 26-27, 29.)

Plaintiff testified that she also suffers emotionally and sees a psychiatrist.  Plaintiff testified that she has daily crying spells, hears voices and has many fears.  Plaintiff testified that she does not like taking a shower because she is fearful of being alone in a closed room and feels as though someone is watching her. Plaintiff testified that she takes medication but does not feel it helps her.  (Tr. 30-32.)  Plaintiff testified that her medication makes her feel groggy and lightheaded, and that her psychiatrist gave her additional prescriptions to try to wean her from such medication.  (Tr. 27-28.)  Plaintiff testified that she did not have these problems while she was working.  (Tr. 32-33.)

Plaintiff testified that she did not begin experiencing physical or emotional problems until she stopped working. Plaintiff testified that she enjoyed working.  Plaintiff testified that she was a good worker and liked the work she performed and the

people with whom she worked.  Plaintiff testified that she had a "normal life" when she worked and that she does not like her current lifestyle of just sitting around all day.  (Tr. 33.)

As to her daily activities, plaintiff testified that she tries to nap during the day inasmuch as she has difficulty sleeping at night.  Plaintiff testified that she tries to interact with her children, but that she is unable to do a lot.  (Tr. 27.)

As to her exertional abilities, plaintiff testified that she can walk for about five minutes and can stand for about five minutes without sitting.  Plaintiff testified that she can sit for ten to fifteen minutes.  Plaintiff testified that she can lift five to ten pounds.  (Tr. 28.)

B.   Testimony of Vocational Expert

Dr. Jeffrey F. McGrowski, a vocational expert, testified at the hearing in response to questions posed by the ALJ.

Dr. McGrowski classified plaintiff's past work in data entry as sedentary and semi-skilled, and as a laboratory supervisor as medium and skilled.  (Tr. 34.)

The ALJ asked Dr. McGrowski to consider an individual of plaintiff's age and with the same education and work experience, and to assume such an individual to be

> limited to performing light exertion level work.  The individual can occasionally climb stairs and ramps, and never climb ropes, ladders and scaffolds, can occasionally stoop, kneel, crouch, and crawl.  The individual

- 4 -

> should avoid concentrated exposure to
> unprotected heights, excessive vibration,
> hazardous machinery.  And the individual is
> limited to unskilled work only.

(Tr. 34-35.)

Dr. McGrowski testified that such a person could not perform plaintiff's past work but could perform light and unskilled jobs such as bench assembler, of which 2,000 such jobs exist in the State of Missouri and over 100,000 nationally; office helper, of which 4,000 such jobs exist in the State of Missouri and over 200,000 nationally; and packer of small items, of which 1,500 such jobs exist in the State of Missouri and over 100,000 nationally. (Tr. 35.)

The ALJ then asked Dr. McGrowski to consider the same individual as the first hypothetical, but that the individual was limited to sedentary work.  Dr. McGrowski testified that such a person could perform work as a packer of pharmaceuticals, cosmetics, and small items, with 300 such jobs existing in the State of Missouri and over 17,000 nationally; label cutter, with 200 such jobs existing in the State of Missouri and over 10,000 nationally; and small assembly work, of which 500 such jobs exist in the State of Missouri and over 50,000 nationally.  (Tr. 35-36.)

The ALJ then asked Dr. McGrowski to add an additional limitation to the person described in the second hypothetical, and specifically, that "any job must allow for occasional unscheduled

disruptions of both the work and work week, secondary to pain and the necessity to lie down for extended periods of time, as effects of medication, those types of things." (Tr. 36.) Dr. McGrowski testified that such a person could not perform any jobs of which he was aware. (Tr. 36.)

### III.  Medical Records[2]

Plaintiff visited Dr. Francisco J. Garriga of North County Medicine and Rheumatology on March 9, 2005, and complained of having pain and burning sensations in her feet and legs for a couple of months, but that the condition had recently worsened. Plaintiff reported having "broken sleep." Dr. Garriga prescribed Neurontin[3] for plaintiff. (Tr. 307.)

Plaintiff visited Dr. Garriga on April 8, 2005, and reported an increase in her symptoms, especially in her arms, legs and shoulders. Review of systems was positive for Raynaud's, pain,

---

[2]Additional evidence which was not before the ALJ was submitted to and considered by the Appeals Council. This evidence consists of treatment notes dated May 14 to August 5, 2009, from Dr. Francisco J. Garriga; and a Mental Residual Functional Capacity Questionnaire completed October 23, 2009, by Clinical Social Worker, Mary McBride. (Tr. 516-25; 527-31.) The Court must consider these records in determining whether the ALJ's decision was supported by substantial evidence. Frankl v. Shalala, 47 F.3d 935, 939 (8th Cir. 1995); Richmond v. Shalala, 23 F.3d 1441, 1444 (8th Cir. 1994). For the sake of continuity, discussion of these records is incorporated with that of the records before the ALJ at the time of his decision.

[3]Neurontin (Gabapentin) is used to relieve the pain of postherpetic neuralgia. Medline Plus (last revised July 15, 2011)<http://www.nlm.nih.gov/medlineplus/druginfo/meds/a694007.html>.

dry mouth, stiffness, poor energy level, depression, and swelling. Plaintiff reported that Neurontin did not help her pain or sleep, but that the medication nevertheless made her drowsy.  Physical examination was normal with respect to examination for tenderness, range of motion, and trigger points.  Plaintiff was diagnosed with lupus erythematosus (LE) and insomnia.  Plaintiff was prescribed Nortriptyline,[4] and blood tests were ordered.  (Tr. 305.)

On April 11, 2005, plaintiff reported to Dr. Garriga that there was no change to her condition.  An echocardiogram with doppler was ordered.  (Tr. 307.)

A chest x-ray taken April 26, 2005, yielded no evidence of active lung disease.  (Tr. 300.)  Plaintiff underwent an echocardiogram that same date for evaluation of possible pulmonary hypertension.   Trace to mild mitral insufficiency was noted. Otherwise, the echocardiogram was predominantly normal.  (Tr. 310-11.)  A pulmonary function test performed that same date was normal.  (Tr. 308-09.)  On April 28, 2005, plaintiff was informed of the test results.  Plaintiff reported to Dr. Garriga's office that she was sleeping better with Nortriptyline.  (Tr. 307.)

On November 8, 2005, Dr. Garriga noted that plaintiff had "gone through much stress" and was not sleeping well.  It was noted that plaintiff was recently divorced.  Plaintiff reported having

---

[4]Nortriptyline is used to treat depression and is sometimes used to treat panic disorders and postherpetic neuralgia.  Medline Plus (last reviewed Sept. 1, 2008)<http://www.nlm.nih.gov/ medlineplus/druginfo/meds/a682620.html>.

many aches and pains and that she had a poor energy level. Plaintiff reported having had a rash recently on her face. Plaintiff also reported having some trouble swallowing, depression, hair loss, swelling, dry mouth, and stiffness. It was noted that plaintiff had been off of her medication for months. Dr. Garriga noted plaintiff to look sad. Physical examination showed no rash and no synovitis. Plaintiff had full range of motion, but many tender and trigger points were noted. Dr. Garriga diagnosed plaintiff with connective tissue disease (CTD), probable LE; myofascial pain; and stress. Plaintiff was instructed to restart Humira.[5]   Soma[6] was prescribed. Plaintiff was counseled and instructed to return in four months. (Tr. 304, 318.)

Plaintiff returned to Dr. Garriga on February 24, 2006, and reported a marked increase in hand pain. Plaintiff also reported that she could not sleep well and that Humira was not helpful to her. Plaintiff reported having dry eyes, dry mouth, pain, stiffness, and poor energy level. Examination showed tenderness about the wrists and fingers with minimal wrist synovitis. Dr. Garriga diagnosed plaintiff with CTD with possible

---

[5]Humira is used to relieve the symptoms of certain autoimmune disorders, including rheumatoid arthritis, Crohn's disease, ankylosing spondylitis, and psoriatic arthritis. Medline Plus (last revised Apr. 15, 2011)<http://www.nlm.nih.gov/medlineplus/ druginfo/meds/a603010.html>.

[6]Soma is a muscle relaxant used to relax muscles and relieve pain and discomfort caused by strains, sprains and other muscle injuries. Medline Plus (last reviewed Aug. 1, 2010)<http:// www.nlm.nih.gov/medlineplus/druginfo/meds/a682578.html>.

Sjogren's disease. Plaintiff was instructed to discontinue Humira, and Prednisone[7] was prescribed. Plaintiff was instructed to return in four weeks. (Tr. 303, 317.)

Plaintiff failed to appear for a scheduled appointment with Dr. Garriga on March 17, 2006. (Tr. 302.)

Plaintiff telephoned Dr. Garriga's office on March 29, 2006, complaining of pain and swelling on the left side and especially in her thigh. Plaintiff reported that Prednisone caused her to have headaches, making her feel as though her head were to explode. Dr. Garriga saw plaintiff that same date as "an urgent appointment" because of headaches, weakness, and pain in plaintiff's neck. Dr. Garriga noted plaintiff to be almost tearful. Plaintiff reported no improvement with Prednisone. Physical examination showed the trapezii to be very tight bilaterally. No rash or synovitis was noted. Dr. Garriga diagnosed plaintiff with systemic lupus erythematosus (SLE) and myofascial pain. Dr. Garriga injected the trapezii with Lidocaine and Depo-Medrol,[8] and prescribed Baclofen.[9] Plaintiff was

---

[7]Prednisone is a corticosteroid used to treat lupus by reducing swelling and redness and by changing the way the immune system works. Medline Plus (last reviewed Sept. 1, 2008)<http://www.nlm.nih.gov/medlineplus/druginfo/meds/a601102.html>.

[8]Depo-Medrol is a corticosteroid used to relieve inflammation. Medline Plus (last reviewed Sept. 1, 2008)<http://www.nlm.nih.gov/medlineplus/druginfo/meds/a601157.html>.

[9]Baclofen acts on the spinal cord nerves and decreases the number and severity of muscle spasms caused by multiple sclerosis or spinal cord diseases. It also relieves pain and improves muscle

instructed to call if there was no improvement but to otherwise return in two months.  Dr. Garriga determined to refer plaintiff to a pain specialist.  (Tr. 302, 306, 316.)

Plaintiff telephoned Dr. Garriga's office on March 31, 2006, and complained of pain across the lower part of her back. Dr. Garriga noted that he would administer an injection to the lower back if plaintiff's upper back had improved.  Plaintiff reported that there was no improvement in her upper back.  (Tr. 307.)

Plaintiff visited Dr. Stephen G. Smith on April 4, 2006, in consultation for pain management.  Plaintiff reported having thoracic and lumbar-sacral pain with considerable increase in pain subsequent to the recent injection in Dr. Garriga's office. Plaintiff reported the pain to have slightly decreased since that time but that the pain increases with standing and sitting for prolonged periods of time, and with bending.  Plaintiff reported the pain to decrease with muscle relaxants and sleeping, but that her sleeping had decreased because of the pain.  Dr. Smith noted plaintiff's medical history to be remarkable only for lupus, and that she had no history of depression or anxiety.  Dr. Smith noted plaintiff's current medications to be Prednisone, Baclofen and

---

movement.   Medline  Plus  (last  reviewed  Sept.  1,  2008) <http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682530.html>.

Aleve.[10]   Physical examination showed limited range of motion with forward flexion, extension and rotation about the low back, and decreased lumbar lordosis which caused the greatest amount of pain. Range of motion about the hips was normal, as was motor strength of the hips, knees and ankles.   Sensation was noted to be intact. Straight leg raising was negative.   Chest lift in the prone position caused mild low back pain.   Palpation of the low back showed significant myofascial trigger points in the left gluteals and piriformis.   Significant myofascial pain was likewise noted in the rhomboids and levator scapulae.   Upon conclusion of the examination, Dr. Smith diagnosed plaintiff with spondylosis of the lumbar spine with myofascial pain in the left gluteals and piriformis, and in the rhomboids and levator scapulae.   Plaintiff expressed no interest in injection therapy.   Plaintiff was prescribed Ultram[11] and was referred back to Dr. Garriga.   (Tr. 314-15.)

On April 6, 2006, Dr. Garriga determined for plaintiff to discontinue the Tramadol which had been prescribed by the pain center, due to headaches and dizziness.   (Tr. 306.)

---

[10]Aleve (Naproxen) is used to relieve pain, tenderness, swelling, and stiffness caused by osteoarthritis, rheumatoid arthritis, and ankylosing spondylitis.   Medline Plus (last revised May 16, 2011)<http://www.nlm.nih.gov/medlineplus/druginfo/meds/a681029.html>.

[11]Ultram (Tramadol) is used to relieve moderate to moderately severe pain.   Medline Plus (last reviewed Feb. 1, 2011)<http://www.nlm.nih.gov/medlineplus/druginfo/meds/a695011.html>.

On April 13, 2006, plaintiff telephoned Dr. Garriga's office with complaints of increased back pain.  Plaintiff also reported that she was not sleeping.  Plaintiff was instructed to increase her dosage of Prednisone.  (Tr. 306.)

On April 18, 2006, plaintiff reported to Dr. Garriga that there was no improvement in her condition.  It was noted that she had been off of work since March 27.  Plaintiff was instructed to decrease her dosage of Prednisone, and Tizanidine[12] was prescribed. (Tr. 306.)

Plaintiff visited Dr. Garriga on April 24, 2006, and reported that she could not swallow and had lost weight.  Plaintiff had lost eight pounds since her appointment on March 29, 2006. Plaintiff complained that she had a lot of pain and swelling in her arms and hands, and stiffness in her fingers.  Plaintiff also reported that she had back pain in her upper and lower back if she stood or sat for too long.  Plaintiff reported that she slept a lot and that Prednisone was not helpful.  Dr. Garriga noted plaintiff's history of LE and that she had strong titer antibodies.  Dr. Garriga diagnosed plaintiff with dysphagia and determined for plaintiff to undergo additional evaluation.  Plaintiff was

---

[12]Tizanidine is used to relieve the spasms and increased muscle tone caused by multiple sclerosis or spinal injury.  Medline Plus (last reviewed Sept. 1, 2008)<http://www.nlm.nih.gov/medlineplus/ druginfo/meds/a601121.html>.

prescribed Lexapro[13] and CellCept.[14]   (Tr. 301, 313.)

Plaintiff returned to Dr. Garriga on September 6, 2006, and reported that sleep continued to be a problem, and that Norflex[15] did not help.   Plaintiff was noted to be depressed and under stress.   Plaintiff was diagnosed with CTD and insomnia, and Rozerem[16] was prescribed.   (Tr. 321.)

On January 8, 2007, Dr. Garriga noted plaintiff to have increased her dosage of Prednisone due to increased pain, and that such increased dosage helped a little.   Plaintiff reported having pain, dry eyes, dry mouth, stiffness, and low energy levels.   It was questioned whether plaintiff suffered depression.   Physical examination was normal.   Plaintiff was diagnosed with SLE and insomnia, with steroid therapy.   Tegretol[17] was prescribed.   (Tr.

---

[13]Lexapro is used to treat depression and generalized anxiety disorder.   Medline Plus (last revised Aug. 15, 2011)<http://www.nlm.nih.gov/medlineplus/druginfo/meds/a603005.html>.

[14]CellCept is an immunosuppressive agent which weakens the body's immune system.   It is used to help prevent transplant organ rejection, but is also used to treat Crohn's disease.   Medline Plus (last revised Dec. 1, 2009)<http://www.nlm.nih.gov/medlineplus/druginfo/meds/a601081.html>.

[15]Norflex is used to relieve pain and discomfort caused by strains, sprains and other muscle injuries.   Medline Plus (last revised Dec. 1, 2010)<http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682162.html>.

[16]Rozerem is used to help patients who have sleep-onset insomnia to fall asleep more quickly.   Medline Plus (last revised May 1, 2009)<http://www.nlm.nih.gov/medlineplus/druginfo/meds/a605038.html>.

[17]Tegretol is used to treat trigeminal neuralgia.   Medline Plus (last revised Sept. 1, 2009)<http://www.nlm.nih.gov/medlineplus/

320.)

Plaintiff returned to Dr. Garriga on February 20, 2007, and reported that she had been out of Prednisone for one week. Plaintiff complained of a lot of pain and swelling in her arms, hands and legs, as well as low back pain.  Plaintiff reported her hands to "lock up."  Plaintiff reported her energy levels to be better and that she was sleeping better.  Plaintiff reported that her pain worsened when she was taken off of CellCept.  Plaintiff was diagnosed with LE, and CellCept and Prednisone were prescribed. (Tr. 345.)

On March 19, 2007, plaintiff reported to Dr. Garriga that she stopped taking CellCept because it was causing nausea and headaches.  Plaintiff reported her pain to be at a level six on a scale of one to ten.  Plaintiff's energy level was low, and plaintiff reported having stiffness, pain, dry eyes, dry mouth, hair loss, and depression.  Dr. Garriga noted plaintiff to be tearful.  Dr. Garriga determined to admit plaintiff to the hospital for intravenous administration of steroids.  (Tr. 344.)

Plaintiff was admitted to Depaul Health Center on March 22, 2007, for an acute exacerbation of SLE, leukopenia, and dizziness secondary to medication.  Plaintiff reported having severe pain in her legs, nausea, headaches, and diffuse pains throughout her body.  Dr. Garriga noted upon admission that

---

druginfo/meds/a682237.html>.

plaintiff reported to him three days prior that she could no longer manage at home.  Dr. Garriga noted plaintiff's diagnosis of lupus to date back to April 2003, with symptoms being present since 2002. Plaintiff was admitted to the hospital for intravenous steroids and for a more exhaustive physical therapy evaluation.  Dr. Garriga noted plaintiff's leg pain to have previously been thought to be neuropathic, but that Neurontin did not help.  Plaintiff reported that Tegretol helped with the pain.  During the course of her hospitalization, plaintiff experienced episodes of dizziness which were suspected to be related to medication.  Myocardial perfusion scan and adenosine thallium tests were unremarkable.  Plaintiff had no improvement with her leg pains, and she was unable to sleep. Plaintiff was discharged home on March 24, 2007, so that she could get more sleep.  Plaintiff was prescribed Neurontin and Prednisone upon discharge.  (Tr. 322-37.)

On April 24, 2007, plaintiff reported to Dr. Garriga that she did not feel well and that her legs felt heavy.  Plaintiff currently had no swelling of the hands, but she reported intermittent swelling since being discharged from the hospital. Dr. Garriga diagnosed plaintiff with SLE and myofascial pain. Zoloft[18] and Baclofen was prescribed.  Plaintiff was instructed to return in four weeks.  (Tr. 343.)

_____

[18]Zoloft is used to treat depression, obsessive-compulsive disorder, panic attacks, post-traumatic stress disorder, and social anxiety disorder.  Medline Plus (last revised Aug. 15, 2011) <http://www.nlm.nih.gov/medlineplus/druginfo/meds/a697048.html>.

- 15 -

On  May  22,  2007,  Dr.  Garriga  declined  plaintiff's
telephone  request  for  an  increased  dosage  of  Prednisone.   Dr.
Garriga  said  that  he  would  see  her  the  following  week.   (Tr. 447.)

Plaintiff  visited  Dr.  Garriga  on  May  30,  2007,  and
complained  that  she  was  in  much  pain  and  was  not  sleeping  well.
Plaintiff  also  reported  that  her  father  suddenly  died  recently.
Review  of  systems  was  positive  for  facial  rash,  Raynaud's,  dry
mouth,  stiffness,  hair  loss,  and  depression.   Plaintiff  reported
her  pain  to  be  at  a  level  ten  on  a  scale  of  one  to  ten.   It  was
questioned  whether  plaintiff  took  her  medications.   Plaintiff  was
noted  to  be  tearful.   It  was  noted  that  plaintiff's  case  manager
suggested  that  plaintiff  undergo  a  psychiatric  consult.   Physical
examination  was  unremarkable  with  notation  that  plaintiff  had  full
range  of  motion  with  no  tenderness  or  trigger  points.   Plaintiff
was  diagnosed  with  depression  and  SLE.   Dr.  Garriga  questioned
whether  plaintiff's  rash  was  because  of  her  steroid  therapy.   Dr.
Garriga  prescribed  Vivactil[19]  for  plaintiff  and  referred  her  to  Dr.
Lafferty.   (Tr. 435.)

Plaintiff  was  evaluated  on  June  28,  2007,  by  psychologist
Martin  Rosso  for  disability  determinations.   The  purpose  of  the
evaluation  was  to  assess  plaintiff's  cognitive  ability  level  and
mental  status.   (Tr. 353-56.)   It  was  noted  that  plaintiff  had

---

[19]Vivactil  is  used  to  treat  depression.   Medline Plus  (last
reviewed   Sept.   1,   2008)<http://www.nlm.nih.gov/medlineplus/
druginfo/meds/a604025.html>.

- 16 -

lupus and rheumatoid arthritis.  Plaintiff's medications were noted
to be Mirtazapine,[20] Rituxan,[21] Vivactil, Prednisone, and Gabapenten.
Plaintiff  reported  having  recently  begun  seeing  a  psychiatrist.
(Tr.  354.)   Plaintiff  reported  that  she  did  not  want  to  be
hospitalized  for  fear  that  her  ex-husband  may  "try  to  get  the
children."   Plaintiff  reported  that  lupus  prevented  her  from
getting out and that she had no hobbies.  Plaintiff reported that
she used to enjoy reading but that she now was unable to remember
what she reads.  (Tr. 355.)  Plaintiff reported to Dr. Rosso that
she had been depressed since being diagnosed with lupus.  As to
plaintiff's level of intellectual functioning, Dr. Rosso made the
following observations:

> Jeanette  [sic]  demonstrates  below  average
> intellectual  functioning.   Her  vocabulary
> development is below average.  She is unable
> to  explain  the  meaning  of  such  words  as
> "reluctant."  Her abstract verbal reasoning is
> below  average.   She  is  below  average  in  her
> ability  to  solve  similarities  items.   She  is
> unable to explain how such words as, "work and
> play"  are  alike.   She  is  also  unable  to
> explain an abstract verbal proverb.  She is
> below  average  in  solving  everyday  problems
> using language.  For example, she is unable to
> answer  the  question,  "Why  does  land  in  the

---

[20]Mirtazapine is used to treat depression.  Medline Plus (last
reviewed  Sept.  1,  2008)<http://www.nlm.nih.gov/medlineplus/
druginfo/meds/a697009.html>.

[21]Rituxan is used to treat the symptoms of rheumatoid arthritis
by causing the death of certain blood cells that may cause the
immune system to attack the joints.  Medline Plus (last revised
Mar.  1,  2010)<http://www.nlm.nih.gov/medlineplus/druginfo/meds/
a607038.html>.

city cost more than land in the country." She is below average in her ability to mentally solve arithmetic word problems. She demonstrates below average arithmetic mental calculation ability and below average arithmetic reasoning. She is unable to calculate math problems that require two steps to arrive at an answer. For example, she is unable to calculate, "What is the average of 5, 10 and 15?" She is only able to solve simple one step problems of simple addition and subtraction. She relied upon her fingers to perform the calculations. Her fund of learned verbal information is below average for her age. For example, she does not know the answer to such questions as, "Who was President of the U.S. during the Civil War?" His [sic] overall language functioning appears to be below average. She demonstrates a below average short-term auditory memory and below average level of concentration at this time. She is only able to perform serial three's. She demonstrates a below average working memory. She is only able to remember three digits and repeat the sequence in reverse order. Her long-term verbal memory is below average. She is unable to remember any of three words after twenty minutes.

(Tr. 355.)

Plaintiff was noted to be oriented times three, with coherent speech and organized thoughts. No tangential or delusional thinking was noted. Plaintiff reported having thoughts of suicide, but that her children gave her hope. Plaintiff reported that her father had recently passed away, that he has been talking to her since his death, and that she has seen his shadow or outline. Dr. Rosso noted plaintiff's affect to be significantly depressed and further noted that plaintiff cried frequently throughout the

- 18 -

evaluation.  Plaintiff reported having frequent periods of anxiety and that she felt jumpy, had difficulty breathing and experienced pain in her chest.  Plaintiff reported that her children tell her that she has difficulty remembering things they have told her, and plaintiff admitted to having trouble with remembering things.  Plaintiff reported that she is embarrassed when she is unable to remember what someone has told her.  Upon conclusion of the evaluation, Dr. Rosso opined:

> Jeanette's [sic] cognitive ability is below average.  Based upon her history of having completed high school, her level of cognitive functioning has declined.  She also demon-strates significant difficulty with short term and long-term memory.  Her decline in cognitive functioning may be related to her significant depression.  At this time, she demonstrates significant depression, which she reports began after she had been diagnosed with Lupus.  Due to her decline in cognitive functioning and memory, Jeanette [sic] does not appear at this time capable of managing her funds.

(Tr. 356.)

Dr. Rosso diagnosed plaintiff with major depressive disorder—single episode, and assigned a Global Assessment of Functioning (GAF) score of 40.[22]  (Tr. 356.)

_____

[22]A GAF score considers "psychological, social, and occupational functioning on a hypothetical continuum of mental health/illness."  Diagnostic & Statistical Manual of Mental Disorders, Text Revision 34 (4th ed. 2000).  A GAF score of 31-40 indicates some impairment in reality testing or communication (e.g., speech is at times illogical, obscure, or irrelevant) or major impairment in several areas, such as work or school, family

On July 13, 2007, plaintiff underwent a consultative physical examination for disability determinations.   Dr. Fedwa Khalifa noted plaintiff's chief complaints to be SLE, rheumatoid arthritis and depression.   With respect to her SLE, plaintiff reported that she has pain and swelling with stiffness in all of her joints and follows up with her rheumatologist every two months. Plaintiff reported that she can walk for half a block, stand for fifteen minutes, can bend her knee with difficulty, but cannot squat.   With respect to her rheumatoid arthritis, plaintiff reported that the condition primarily affects her hand, wrist, elbow, shoulder, hip, and ankle with swelling, stiffness and pain. Plaintiff reported a tendency to drop things and difficulty with fine manipulative actions such as buttoning clothes.   Plaintiff also reported that she cannot carry any weight over her head and has difficulty combing her hair.   With respect to her depression, plaintiff reported her condition to be stable with medication. Examination of the back and extremities showed no spasm, tenderness or swelling.   Plaintiff was noted to have pain upon range of motion of the shoulder, but with no limitation of movement.   Pain was noted in the thigh with hip and knee flexion, but joint movements were within normal limits.   Straight leg raising was negative.

---

relations, judgment, thinking, or mood (e.g., depressed man avoids friends, neglects family, and is unable to work; child frequently beats up younger children, is defiant at home, and is failing at school).

Examination of the nervous system was unremarkable. Upon completion of the examination, Dr. Khalifa diagnosed plaintiff with SLE with complaints of pain, swelling and stiffness in all joints; rheumatoid arthritis affecting upper extremities with severe pain with any joint movement; and depression, stable. (Tr. 358-64.)

On July 17, 2007, V. Kinsey, a medical consultant with disability determinations, completed a Physical Residual Functional Capacity Assessment wherein s/he opined that plaintiff could occasionally lift and carry twenty pounds, frequently lift and carry ten pounds, stand or walk about six hours in an eight-hour workday, and sit about six hours in an eight-hour workday. Consultant Kinsey opined that plaintiff had no limitations with pushing or pulling with either her feet or hands. Consultant Kinsey also opined that plaintiff could occasionally climb ramps and stairs, stoop, kneel, crouch, and crawl; could frequently balance; but could never climb ladders, ropes or scaffolds. Consultant Kinsey opined that plaintiff had no manipulative, visual or communicative limitations. As to environmental limitations, Consultant Kinsey opined that plaintiff should avoid concentrated exposure to extreme cold and vibration, but was otherwise unlimited. (Tr. 365-70.)

On July 26, 2007, Geoffrey Sutton, a psychological consultant with disability determinations, completed a Psychiatric Review Technique Form in which he opined that plaintiff's mental

- 21 -

impairment was not severe, specifically finding that plaintiff had mild restrictions of daily activities; mild difficulties in maintaining social functioning; mild difficulties in maintaining concentration, persistence or pace; and no episodes of decompensation. (Tr. 379-82.)

On July 30, 2007, plaintiff failed to appear for a scheduled appointment with Dr. Garriga. (Tr. 436.)

Plaintiff visited Dr. Garriga on August 1, 2007, for an infusion of Rituxan. Plaintiff experienced itching and chills with the injection. Plaintiff was given intravenous Benadryl, and it was noted that plaintiff would be given Benadryl prior to any further infusions of Rituxan. (Tr. 447.)

Plaintiff returned to Dr. Garriga on August 18, 2007, for another Rituxan infusion. It was noted that plaintiff began experiencing chest pain upon administration, and the procedure was briefly stopped. Upon reinstitution, plaintiff tolerated the procedure well. Plaintiff's next Rituxan infusion was noted to be in six weeks. (Tr. 447.)

Plaintiff telephoned Dr. Garriga on August 30, 2007, complaining of chest pain, shortness of breath, left shoulder pain, and fatigue. Dr. Garriga advised plaintiff to go to the emergency room. (Tr. 447.)

Plaintiff was admitted to the emergency room at DePaul Health Center on August 30, 2007, with complaints of chest

discomfort and shortness of breath.  Plaintiff reported the
pressure-like sensation to have begun two weeks prior when she
received her lupus medication by infusion.  Plaintiff reported the
pain to be constant, to worsen when she walks, and to be at a level
seven on a scale of one to ten.  It was also noted that plaintiff
took an antidepressant.  Physical examination was unremarkable.  A
CT scan of the chest yielded unremarkable results.  The results of
an echocardiogram were likewise normal.  Plaintiff was given
Toradol[23] for pain.  (Tr. 408-33.)

On September 26, 2007, plaintiff telephoned Dr. Garriga
and complained that she was achy and sore.  Prednisone was
prescribed.  (Tr. 448.)

Plaintiff visited Dr. Garriga on September 21, 2007, and
reported that she had been taking an antidepressant as prescribed
by a psychiatrist for two months.  Plaintiff also reported having
a little pain in her legs.  Plaintiff reported her pain level to be
at a level seven.  Plaintiff reported having sharp pains in her
head.  Review of systems was positive for rash, depression and
stiffness.  Dr. Garriga diagnosed plaintiff with LE with positive
ssA antibodies.  It was noted that plaintiff was taking Rituxan.
Dr. Garriga noted that he needed a list of plaintiff's other
medications and told plaintiff that he would call her with a

---

[23]Toradol is used to relieve moderately severe pain.  Medline
Plus (last revised Oct. 1, 2010)<http://www.nlm.nih.gov/
medlineplus/druginfo/meds/a693001.html>.

treatment plan.  (Tr. 436.)

On January 18, 2008, Dr. Garriga completed a Physical Residual Functional Capacity Questionnaire in which he reported that he sees plaintiff every three to four months for treatment of systemic lupus for which plaintiff's prognosis was fair.  Dr. Garriga reported that plaintiff suffered pain, weakness, poor concentration, insomnia, headaches, and rash on account of her condition.  Dr. Garriga described plaintiff's pain to be over most muscles and joints, and to include headaches.  Dr. Garriga reported that the pain worsens with activity and is greater than a level seven on a scale of one to ten.  Dr. Garriga explained that facial rash and positive ANA and ssA antibodies constituted clinical findings and objective signs of plaintiff's disease, and that the disease is treated with CellCept and Prednisone.  Dr. Garriga reported, however, that plaintiff experienced side effects from the medication and did not feel that her condition had improved with the medication.  Dr. Garriga reported that plaintiff was not a malingerer, and that her depression and anxiety contributed to the severity of her symptoms and functional limitations.  Dr. Garriga opined that plaintiff's pain or other symptoms would constantly interfere with the attention and concentration needed to perform simple work tasks.  Dr. Garriga opined that plaintiff was incapable of low stress jobs, noting that plaintiff takes a lot of medication and cannot concentrate.  As to plaintiff's functional limitations,

Dr. Garriga opined that plaintiff could walk two city blocks without rest or severe pain, could sit for thirty minutes at a time, and could stand for fifteen minutes at a time.  Dr. Garriga opined that plaintiff could sit for less than two hours in an eight-hour workday and could stand and/or walk for less than two hours in an eight-hour workday.  Dr. Garriga opined that plaintiff would need to walk about every twenty minutes during an eight-hour workday for five minutes each time.  Dr. Garriga opined that plaintiff would need a job which permitted shifting positions at will from sitting, standing or walking.  Dr. Garriga opined that plaintiff would need an unscheduled break to rest approximately every two hours during an eight-hour workday, and that such breaks would need to be fifteen minutes in length.  Dr. Garriga opined that plaintiff could occasionally lift and carry less than ten pounds, could rarely lift and carry ten pounds, and could never lift and carry twenty or more pounds.  Dr. Garriga opined that plaintiff could rarely twist and could never stoop, crouch, squat, climbs ladders, or climb stairs.  Dr. Garriga opined that plaintiff did not have significant limitations with reaching, handling or fingering.  Dr. Garriga opined that plaintiff would be absent from work more than four days a month on account of her impairment or treatment.  Dr. Garriga reported that the onset of the described limitations occurred in April 2003.  (Tr. 295-99.)

Plaintiff returned to Dr. Garriga on January 21, 2008,

who noted plaintiff to have had many emergency room visits. Plaintiff reported her current pain to be at a level nine. Dr. Garriga noted the presence of dry eyes, dry mouth, stiffness, and depression. Plaintiff also reported having urinary frequency and incontinence. Plaintiff was tearful. Physical examination was normal. Plaintiff was diagnosed with LE, urinary and gastrointestinal symptoms, and depression. (Tr. 437.)

On February 5, 2008, plaintiff failed to appear for a scheduled appointment with Dr. Garriga. (Tr. 448.)

On February 22 and March 7, 2008, plaintiff received Rituxan infusions. Plaintiff's complaints of chest pain were noted. (Tr. 448.)

On June 23, 2008, Dr. Garriga noted plaintiff's elevated blood pressure and advised plaintiff to contact her primary care physician. (Tr. 449.)

Plaintiff visited Dr. Michael Spezia on July 30, 2008, and requested that she undergo a kidney function test. Dr. Spezia noted plaintiff's medical history to include a diagnosis of lupus. Upon examination, plaintiff was diagnosed with LE, and laboratory tests were ordered. Plaintiff was prescribed medication, including Lexapro. (Tr. 397-98.)

Plaintiff underwent echocardiography and doppler study on August 11, 2008, in response to her complaints of chest pain and hypertension. The tests showed left atrial enlargement with

- 26 -

redundant mitral valve leaflets, with mild mitral regurgitation. Otherwise, the results of the tests were normal.  (Tr. 394.)

Plaintiff visited Dr. Spezia on August 27, 2008, and complained of having trouble sleeping, and specifically that she had trouble going to sleep and staying asleep.  Plaintiff was advised that Dr. Spezia did not give prescriptions for such conditions.  (Tr. 393.)

On September 4, 2008, Dr. Garriga refilled plaintiff's prescription for Prednisone.  (Tr. 447.)

Plaintiff visited Dr. Garriga on October 10, 2008, and complained of experiencing numbness in the left upper and lower extremities when leaning on that side.  Plaintiff also reported that her hands get stiff.  It was noted that plaintiff took Tylenol for pain.  Plaintiff also reported improvement with continued doses of Rituxan.  Plaintiff was tearful.  Dr. Garriga noted plaintiff to be taking Cymbalta for depression.  Physical examination showed no swelling and full range of motion about all the joints.   Dr. Garriga diagnosed plaintiff with CTD, depression, unexplained paresthesia, and chronic pain.  Another infusion of Rituxan was administered.  Laboratory testing was ordered.  Plaintiff was instructed to return in four months.  (Tr. 385, 449.)

On October 13, 2008, plaintiff was informed that recent blood tests showed her to be anemic.  Additional testing was recommended.  (Tr. 449.)

- 27 -

On October 21, 2008, plaintiff telephoned Dr. Garriga and informed him that since taking Rituxan, she had experienced a lot of pain and burning sensation throughout her body. Plaintiff also reported her feet, ankles and hands to be swollen. Plaintiff reported her symptoms to continue all day and night. Dr. Garriga questioned whether or not to administer the second dose of Rituxan. (Tr. 449.)

Plaintiff returned to Dr. Garriga on November 7, 2008. Plaintiff reported that she was not doing well with Rituxan. It was noted that plaintiff continued to take Prednisone. Review of systems was positive for the presence of Raynaud's, and side effects from medications were questioned. Physical examination was unremarkable. Dr. Garriga diagnosed plaintiff with LE/CTD and leukopenia, and laboratory tests were ordered. (Tr. 384.)

On November 12, 2008, Dr. Garriga noted plaintiff's lab tests to show microcytic anemia. It was determined that plaintiff would not receive Rituxan for at least one month. (Tr. 450.)

On March 1, 2009, Dr. Garriga advised plaintiff to increase her intake of vitamin D inasmuch as laboratory tests showed her to have decreased levels. (Tr. 450.)

Plaintiff visited Dr. Garriga on March 6, 2009, and complained of pain in her legs, feet and hands. Plaintiff reported having difficulty holding anything in her hands. Plaintiff

- 28 -

reported her primary care physician to have given her Trazodone[24] for sleep and a cream for a rash on her neck and legs.  Review of systems was positive for fever, rash, nodules, difficulty swallowing, dry mouth, swelling, and depression.  Dr. Garriga noted plaintiff to be alert and cooperative but tearful.  Dr. Garriga noted plaintiff's current medications to be Prednisone, Cymbalta, Tylenol Arthritis Pain, and vitamin D.  Physical examination showed all joints to be normal.  Dr. Garriga diagnosed plaintiff with CTD – Sjogren Syndrome and depressive disorder.  Dr. Garriga encouraged plaintiff to see a psychiatrist.  (Tr. 451-52, 454-55.)

In a letter written that same date to Dr. Spezia, Dr. Garriga wrote:

> Jeannette continues to feel poorly.  She is tearful most of the time.  Her mom tried to get her to go to a psychiatric hospital, but she refused.  She continues to complain of severe pain.
>
> Her exam today is unremarkable.
>
> She has autoimmune disease characterized by leukopenia and sicca syndrome with positive autoantibodies.
>
> I haven't added any medication.  I urge her to follow her mother's advice.

(Tr. 453.)

---

[24]Trazodone is used to treat depression and is sometimes used to treat insomnia.  Medline Plus (last revised Aug. 1, 2009)<http://www.nlm.nih.gov/medlineplus/druginfo/meds/a681038.html>.

Plaintiff went to BJC Behavioral Health on June 10, 2009, and reported hearing voices, seeing a man, and having a feeling that the man is watching her and following her.  Plaintiff reported that she does not shower because she does not want the man to see her, and that she wore layers of clothing for protection. Plaintiff's mother accompanied her to the appointment and reported that plaintiff had been trying to convince her that the man was real.  Plaintiff reported becoming very depressed in 2006 after becoming unable to work due to her health problems, and that she has chronic pain, poor memory, crying spells, depressed mood, fatigue, and difficulty concentrating.  Plaintiff also reported high paranoia, not wanting to go out in public, and fear of sleeping.  Plaintiff reported that she saw a psychiatrist and was placed on antidepressants, but that she could not follow up with such treatment when she lost her insurance.  The case manager noted that plaintiff was presently unable to take care of herself due to the severity of her symptoms and recommended hospitalization. Plaintiff was diagnosed with major depressive disorder, severe with psychosis, and was assigned a GAF score of 43.[25]  (Tr. 495-508.)

Plaintiff was admitted to the Metropolitan St. Louis Psychiatric Center on June 10, 2009, and was discharged on June 19, 2009.  Upon admission, plaintiff reported to Dr. Nicholas Nguyen

---

[25]A GAF score of 41-50 indicates serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job).

that her psychiatric issues began when her physical health began to deteriorate due to lupus and rheumatoid arthritis. Plaintiff reported that since the time she could no longer work because of her health, she has had a down mood with broken sleep patterns, decreased interest, excessive guilt, and some hopelessness. Plaintiff also reported having decreased energy, poor concentration, fluctuating appetite, and suicidal ideation in the form of command auditory hallucinations. Plaintiff reported that two months prior, she had begun hearing two voices which were telling her to "leave" and asking "why are you here." Plaintiff also reported having visual hallucinations. Plaintiff reported that her benefits ran out in March 2009 and that she could not afford her medications for lupus and rheumatoid arthritis. Plaintiff reported that she never formally saw a psychiatrist in the past but had been prescribed an antidepressant by her primary care physician about one and a half years prior. Plaintiff could not recall the name of the medication, how long she took it, or whether it changed her mood while she took it. Upon examination, plaintiff was diagnosed with depression and psychosis and was assigned a GAF score of 21.[26] Throughout the course of her hospital stay, plaintiff was treated primarily with medication, with noted

---

[26]A GAF score of 21 to 30 indicates behavior that is considerably influenced by delusions or hallucinations, or serious impairment in communication or judgment (e.g., sometimes incoherent, acts grossly inappropriately, suicidal preoccupation), or inability to function in almost all areas (e.g., stays in bed all day, no job, home or friends).

improvement.   Plaintiff declined extensive interaction with group therapy, given the discord among the patients.   Upon discharge on June 19, plaintiff was diagnosed with major depressive disorder, severe recurrent with psychotic features, and was assigned a GAF score of 71.[27]   Plaintiff's discharge medications included Celexa,[28] Risperdal,[29] Naproxen, Iron, Tramadol, and Trazodone.   Plaintiff was provided prescriptions for Celexa and Risperdal so she could continue on such medications.   Plaintiff was scheduled to see a psychiatrist on June 30, 2009, and was instructed to follow up with People's Health Coverage.   (Tr. 459-87.)

Plaintiff returned to BJC Behavioral Health on June 30, 2009.   Plaintiff was noted to be depressed and tired of living, but

--------

[27]This GAF score of 71 appears on the typewritten Discharge Summary which is signed by Dr. Ben Holt and Dr. Devna Rastogi. (Tr. 459-62.)   A handwritten Aftercare/Discharge Plan completed that same date indicates plaintiff's GAF upon discharge to be 61. This Plan is likewise signed by Dr. Holt.   (Tr. 482.)   A GAF score of 61 to 70 indicates some mild symptoms (e.g., depressed mood and mild insomnia) or some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships.   A GAF score of 71 to 80 indicates transient and expectable reactions to psychosocial stressors (e.g., difficulty concentrating after family argument), with no more than slight impairment in social, occupational or school functioning (e.g., temporarily falling behind in schoolwork).

[28]Celexa is used to treat depression.   Medline Plus (last revised Aug. 15, 2011)<http://www.nlm.nih.gov/medlineplus/druginfo/meds/a699001.html>.

[29]Risperdal is used to treat the symptoms of schizophrenia. Medline Plus (last revised June 15, 2011)<http://www.nlm.nih.gov/medlineplus/druginfo/meds/a694015.html>

was not suicidal and wanted help.   Plaintiff reported that she
continued to have the signs and symptoms of hearing voices and
seeing a man, even after taking Risperdal.   Plaintiff reported that
she has had no sleep because of the voices and because of her pain
due to lupus.   Plaintiff reported that she was tired, cried a lot,
and was hopeless and helpless.   Plaintiff's memory was noted to be
poor and impaired, and it was noted that she had no energy.   Mental
status examination showed plaintiff to be oriented times three and
to have fair eye contact.   Plaintiff was noted to rock in her chair
and to speak softly.   Plaintiff's mood was noted to be depressed
and her affect flat.   Plaintiff's intellect was noted to be
average, with fair insight and judgment.   Plaintiff was diagnosed
with major depressive disorder, recurrent, with psychotic features.
It was noted that steroid-induced psychosis needed to be ruled out.
Plaintiff was assigned a GAF score of 55.[30]   No plan for treatment
was noted.   (Tr. 509-11.)

        Plaintiff returned to Dr. Garriga on July 9, 2009.
Plaintiff reported that she had been placed on antidepressants but
that she experienced drowsiness and parathesias because of them.
Plaintiff reported that despite her drowsiness, she had trouble
sleeping and was tired.   Review of systems was positive for
difficulty swallowing, depression, and swelling in the hands and

_____

        [30]A GAF score of 51 to 60 indicates moderate symptoms (e.g.,
flat affect and circumstantial speech, occasional panic attacks) or
moderate difficulty in social, occupational, or school functioning
(e.g., few friends, conflicts with peers or co-workers).

ankles.  Dr. Garriga noted plaintiff to be alert and cooperative, but to look depressed.   Review of all joints yielded normal results.   No trigger or tender points were noted.   Dr. Garriga diagnosed plaintiff with CTD with anemia, leukopenia, depression, and positive ssA antibodies; high blood pressure; and low vitamin D.   Laboratory testing was ordered, and Dr. Garriga considered prescribing CellCept.  Plaintiff was instructed to call Dr. Garriga with her list of medications and to return in two months.   (Tr. 516-17.)

On July 14, 2009, Dr. Garriga completed a Physical Residual Functional Capacity Questionnaire in which he reported that he had been treating plaintiff since April 2003, that plaintiff was diagnosed with chronic connective tissue disease, and that plaintiff suffered pain, tiredness, weakness, numbness, and depression on account thereof.  Dr. Garriga described plaintiff's pain to be in most joints and proximal muscles and that plaintiff experienced such pain on a daily basis.  Dr. Garriga reported that the pain worsens with activity and mostly is at a level seven on a scale of one to ten.  Dr. Garriga explained that some joint tenderness and strongly positive ssA antibodies constituted clinical findings and objective signs of plaintiff's disease, and that the disease is treated with Rituxan infusions and other immunosuppressives.  Dr. Garriga reported that plaintiff was not a malingerer, and that depression contributed to the severity of

- 34 -

plaintiff's symptoms and functional limitations.  Dr. Garriga described plaintiff as having moderate depression.  Dr. Garriga opined that plaintiff's pain or other symptoms would interfere frequently with the attention and concentration needed to perform simple work tasks.  Dr. Garriga opined that plaintiff was capable of low stress jobs.  As to plaintiff's functional limitations, Dr. Garriga opined that plaintiff could walk two city blocks without rest or severe pain, could sit for thirty minutes at a time, and could stand for fifteen minutes at a time.  Dr. Garriga opined that plaintiff could sit for about two hours in an eight-hour workday and could stand and/or walk for less than two hours in an eight-hour workday.  Dr. Garriga opined that plaintiff would need to walk about every ninety minutes during an eight-hour workday for one minute each time.  Dr. Garriga opined that plaintiff would need a job which permitted shifting positions at will from sitting, standing or walking.  Dr. Garriga opined that plaintiff would need eight unscheduled breaks to rest during an eight-hour workday, and that such breaks would need to be five minutes in length.  Dr. Garriga opined that plaintiff could occasionally lift and carry up to ten pounds, could rarely lift and carry twenty pounds, and could never lift and carry fifty pounds.  Dr. Garriga opined that plaintiff could rarely twist and could never stoop, crouch, squat, climbs ladders, or climb stairs.  Dr. Garriga opined that plaintiff did not have significant limitations with reaching, handling or

- 35 -

fingering. Dr. Garriga opined that plaintiff would be absent from work more than four days a month on account of her impairment or treatment. Dr. Garriga also opined that plaintiff should avoid temperature extremes, fumes, dust, and gases. Dr. Garriga reported that the onset of the described limitations occurred within the previous three years. (Tr. 490-94.)

On October 23, 2009, Clinical Social Worker Mary McBride completed a Mental Residual Functional Capacity Assessment wherein she reported that she met with plaintiff at least two times per week within the previous two months. Ms. McBride noted plaintiff's diagnosis to be major depressive disorder, recurrent, severe, with psychotic features; and that plaintiff's current GAF score was 43, with her highest score within the past year noted to be 50. Ms. McBride noted that plaintiff had taken several antidepressant and anti-psychotic medications, but that none of them had helped her condition, including her current medications of Abilify[31] and Effexor.[32] Ms. McBride reported that plaintiff also currently took Vistaril[33] and Trazodone. Ms. McBride reported that plaintiff

_____

[31]Abilify is used to treat the symptoms of schizophrenia, and is used in combination with an antidepressant to treat depression when symptoms cannot be controlled by the antidepressant alone. Medline Plus (last revised May 16, 2011)<http://www.nlm.nih.gov/medlineplus/druginfo/meds/a603012.html>.

[32]Effexor is used to treat depression. Medline Plus (last revised Mar. 1, 2009)<http://www.nlm.nih.gov/medlineplus/druginfo/meds/a694020.html>.

[33]Vistaril is used to relieve itching caused by allergies, to control nausea and vomiting, and to treat anxiety. Medline Plus

- 36 -

suffers severe insomnia, fatigue, drowsiness, and concentration problems as side effects from the medications.  Ms. McBride opined that plaintiff's prognosis was poor given her history of chronic pain and inability to find an effective medication.  (Tr. 527.) Ms. McBride opined that plaintiff primarily had serious to more severe limitations with respect to her abilities to do unskilled work, stating that

> Jeanette [sic] was unable to recall 3 objects that had been named 3 min[utes] prior in [mental status examination].  Client has been unable to remember doctor app[ointments] and has cancelled due to being depressed and in extreme pain.  She experiences symptoms daily of severe depression and hallucinations of the auditory type.  Client is often distracted during our conversations and app[ointment]. Client was unable to name what to do in case of fire in the building.  All she stated was "cover my nose" in the event of smelling smoke.

(Tr. 529-30.)

Ms. McBride opined that plaintiff primarily had serious to more severe limitations with respect to her abilities to do semi-skilled and skilled work, stating that "Jeanette [sic] was unable to carry out simple instructions regarding where to meet doctor and CSW due to poor memory.  She does not deal well with stress as this increases her pain."  (Tr. 530.)  With respect to plaintiff's ability to perform certain types of jobs, Ms. McBride stated that

(last revised Sept. 1, 2010)<http://www.nlm.nih.gov/medlineplus/ druginfo/meds/a694020.html>.

- 37 -

she observed plaintiff to "respond very softly or not at all to others speaking to her. She cannot take a shower each day due to depression and would easily get lost in a public place due to poor long term memory." (Id.) Ms. McBride opined that plaintiff's psychiatric condition exacerbated her experience of pain, and that plaintiff would be absent from work on multiple occasions. Ms. McBride opined that the described limitations have been present since January 2006. (Tr. 531.)

## IV.  The ALJ's Decision

The ALJ found that plaintiff met the insured status requirements of the Social Security Act and would continue to meet them through December 31, 2011. The ALJ further found that plaintiff had not engaged in substantial gainful activity since September 15, 2006. The ALJ found plaintiff's systemic lupus erythematosus and depression to be severe impairments, but that plaintiff did not have an impairment or combination of impairments which met or medically equaled an impairment listed in 20 C.F.R., Part 404, Subpart P, Appendix 1. The ALJ determined plaintiff's statements regarding the intensity, persistence and limiting effects of her impairments not to be credible. The ALJ found plaintiff to have the residual functional capacity (RFC) to perform light work, with limitations that plaintiff not climb ropes, scaffolds or ladders; avoid concentrated exposure to vibration, industrial hazards and unprotected heights; engage in only

occasional stooping, kneeling, crouching, and crawling; and engage in only occasional climbing of ramps and stairs.  The ALJ found that plaintiff was limited to unskilled work because of her depression.  The ALJ found plaintiff unable to perform her past relevant work.  Considering plaintiff's age, education, work experience, and RFC, the ALJ determined that plaintiff could perform jobs that exist in significant numbers in the national economy, and specifically, bench assembler, office helper and packer.  The ALJ therefore found plaintiff not to be under a disability at any time from September 15, 2006, through the date of the decision.  (Tr. 11-19.)

## V.  Discussion

To be eligible for Social Security Disability Insurance Benefits and Supplemental Security Income under the Social Security Act, plaintiff must prove that she is disabled.  Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir. 2001); Baker v. Secretary of Health & Human Servs., 955 F.2d 552, 555 (8th Cir. 1992).  The Social Security Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A).  An individual will be declared disabled "only if [her] physical or mental impairment or

impairments are of such severity that [she] is not only unable to do [her] previous work but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

To determine whether a claimant is disabled, the Commissioner engages in a five-step evaluation process. See 20 C.F.R. §§ 404.1520, 416.920; Bowen v. Yuckert, 482 U.S. 137, 140-42 (1987). The Commissioner begins by deciding whether the claimant is engaged in substantial gainful activity. If the claimant is working, disability benefits are denied. Next, the Commissioner decides whether the claimant has a "severe" impairment or combination of impairments, meaning that which significantly limits her ability to do basic work activities. If the claimant's impairment(s) is not severe, then she is not disabled. The Commissioner then determines whether claimant's impairment(s) meets or is equal to one of the impairments listed in 20 C.F.R., Subpart P, Appendix 1. If claimant's impairment(s) is equivalent to one of the listed impairments, she is conclusively disabled. At the fourth step, the Commissioner establishes whether the claimant can perform her past relevant work. If so, the claimant is not disabled. Finally, the Commissioner evaluates various factors to determine whether the claimant is capable of performing any other work in the economy. If not, the claimant is declared disabled and

becomes entitled to disability benefits.

The decision of the Commissioner must be affirmed if it is supported by substantial evidence on the record as a whole.  42 U.S.C. § 405(g); Richardson v. Perales, 402 U.S. 389, 401 (1971); Estes v. Barnhart, 275 F.3d 722, 724 (8th Cir. 2002).  Substantial evidence is less than a preponderance but enough that a reasonable person would find it adequate to support the conclusion.  Johnson v. Apfel, 240 F.3d 1145, 1147 (8th Cir. 2001).  This "substantial evidence test," however, is "more than a mere search of the record for evidence supporting the Commissioner's findings."  Coleman v. Astrue, 498 F.3d 767, 770 (8th Cir. 2007) (internal quotation marks and citation omitted).  "Substantial evidence on the record as a whole . . . requires a more scrutinizing analysis."  Id. (internal quotation marks and citations omitted).

To determine whether the Commissioner's decision is supported by substantial evidence on the record as a whole, the Court must review the entire administrative record and consider:

1.   The credibility findings made by the ALJ.

2.   The plaintiff's vocational factors.

3.   The medical evidence from treating and consulting physicians.

4.   The plaintiff's subjective complaints relating to exertional and non-exertional activities and impairments.

5.   Any corroboration by third parties of the plaintiff's impairments.

> 6. The testimony of vocational experts when
>    required which is based upon a proper
>    hypothetical question which sets forth
>    the claimant's impairment.

Stewart v. Secretary of Health & Human Servs., 957 F.2d 581, 585-86
(8th Cir. 1992) (quoting Cruse v. Bowen, 867 F.2d 1183, 1184-85
(8th Cir. 1989)).

The Court must also consider any evidence which fairly detracts
from the Commissioner's decision. Coleman, 498 F.3d at 770;
Warburton v. Apfel, 188 F.3d 1047, 1050 (8th Cir. 1999). However,
even though two inconsistent conclusions may be drawn from the
evidence, the Commissioner's findings may still be supported by
substantial evidence on the record as a whole. Pearsall, 274 F.3d
at 1217 (citing Young v. Apfel, 221 F.3d 1065, 1068 (8th Cir.
2000)). "[I]f there is substantial evidence on the record as a
whole, we must affirm the administrative decision, even if the
record could also have supported an opposite decision." Weikert v.
Sullivan, 977 F.2d 1249, 1252 (8th Cir. 1992) (internal quotation
marks and citation omitted); see also Jones ex rel. Morris v.
Barnhart, 315 F.3d 974, 977 (8th Cir. 2003).

Plaintiff claims that the ALJ's decision is not supported
by substantial evidence on the record as a whole. Plaintiff
specifically contends that the ALJ failed to properly consider
opinion evidence rendered by Dr. Rosso and Dr. Garriga, and failed
to provide a medical basis upon which to base his RFC
determination. Plaintiff also contends that the ALJ failed to

properly consider her credibility in the cause.  The undersigned
will address each of plaintiff's contentions in turn.

A.   Opinion Evidence

          Plaintiff claims that the ALJ failed to properly consider
the opinion of consulting psychologist, Dr. Rosso, and erred in
failing to give controlling weight to the opinion of plaintiff's
treating physician, Dr. Garriga.

          In evaluating opinion evidence, the Regulations require
the ALJ to explain in the decision the weight given to any opinions
from  treating  sources,  nontreating  sources  and  nonexamining
sources.  See 20 C.F.R. §§ 404.1527(f)(2)(ii), 416.927(f)(2)(ii).
The Regulations require that more weight be given to the opinions
of  treating  physicians  than  other  sources.    20  C.F.R.  §§
404.1527(d)(2), 416.927(d)(2).  A treating physician's assessment
of the nature and severity of a claimant's impairments should be
given controlling weight if the opinion is well supported by
medically acceptable clinical and laboratory diagnostic techniques
and is not inconsistent with other substantial evidence in the
record.  20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2).  This is so
because a treating physician has the best opportunity to observe
and evaluate a claimant's condition,

               since  these  sources  are  likely  to  be  the
               medical professionals most able to provide a
               detailed,  longitudinal  picture  of  [a
               claimant's]  medical  impairment(s)  and  may
               bring  a  unique  perspective  to  the  medical

> evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations.

20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2).

As such, evidence received from a treating physician is generally accorded great weight with deference given to such evidence over that from consulting or non-examining physicians. See Thompson v. Sullivan, 957 F.2d 611, 614 (8th Cir. 1992); Henderson v. Sullivan, 930 F.2d 19, 21 (8th Cir. 1991).

Opinions of treating physicians do not *automatically* control in determining disability, however, inasmuch as the Commissioner is required to evaluate the record as a whole. Charles v. Barnhart, 375 F.3d 777, 783 (8th Cir. 2004). When a treating physician's opinion is not given controlling weight, the Commissioner must look to various factors in determining what weight to accord the opinion. 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2). Such factors include the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, whether the treating physician provides support for his findings, whether other evidence in the record is consistent with the treating physician's findings, and the treating physician's area of specialty. 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2). The Regulations further provide that the Commissioner "will always give good reasons in [the]

- 44 -

notice of determination or decision for the weight [given to the] treating source's opinion." 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2).

     1.   *Dr. Rosso*

     In his written decision, the ALJ recognized Dr. Rosso as a consulting psychologist and determined not to accord Dr. Rosso's June 2007 opinion controlling weight:

> As for the opinion evidence, I do not give Dr. Rosso's psychological consultative evaluation controlling weight. Dr. Rosso stated that the claimant's cognitive ability was below average and had declined. This is not supported by the rest of his report. The claimant did not have any problem remembering what psychiatric medications she was taking. Furthermore, the claimant's poor performance is not consistent with her 13 years of education and relatively high earnings.

(Tr. 17.)

Although the ALJ determined not to give *controlling* weight to Dr. Rosso's opinion, he failed to explain what weight he in fact gave the opinion, whether it be substantial weight, little weight, no weight, *et cetera*. Nevertheless, the reasons provided by the ALJ cannot serve as a basis upon which to discount Dr. Rosso's opinion inasmuch as they are not supported by substantial evidence on the record as a whole.

     First, to the extent the ALJ states that Dr. Rosso's conclusion regarding plaintiff's below average cognitive ability

- 45 -

was not supported by the rest of his report, a review of the report *in toto* shows the contrary. Dr. Rosso conducted extensive testing which showed multiple and repeated episodes of below average cognitive functioning. Specifically, Dr. Rosso tested plaintiff with regard to vocabulary, abstract verbal reasoning, similarities, abstract verbal proverbs, problem solving, mental arithmetic, mental calculations, arithmetic reasoning, learned verbal information, overall language functioning, short-term auditory memory, concentration, working memory, and verbal memory. In each of these specific and defined areas, plaintiff demonstrated below average abilities. In light of the extensive nature of Dr. Rosso's specific findings which supported his conclusion regarding plaintiff's cognitive ability, the ALJ's sole reference to plaintiff's ability to remember the names of five medications she was currently taking is an insufficient basis upon which to discount Dr. Rosso's conclusion as unsupported.

In addition, the ALJ determined to discount Dr. Rosso's opinion because plaintiff's poor performance was inconsistent with her thirteen years of education and relatively high earnings. The ALJ failed to acknowledge, however, that Dr. Rosso explicitly recognized plaintiff's performance to indeed represent a decline in cognitive ability and that such decline was attributed to plaintiff's depression. A review of the record as a whole supports this finding. Plaintiff began to exhibit depressive symptoms in

- 46 -

April 2005, and plaintiff's treating physician suspected that plaintiff suffered from depression in January 2007. Plaintiff was ultimately diagnosed with depression in May 2007 and continued with said diagnosis thereafter. As such, although plaintiff exhibited depressive symptoms prior to her work cessation in September 2006, the record shows the degree of her depression to have significantly worsened subsequent thereto, ultimately resulting in a formal diagnosis and treatment. Dr. Rosso evaluated plaintiff subsequent to her formal diagnosis of depression. The ALJ here discounted Dr. Rosso's opinion by comparing Dr. Rosso's findings regarding plaintiff's then-current abilities to what the ALJ assumed to be plaintiff's cognitive abilities she possessed prior to the time she suffered a mental impairment. For the ALJ to rely on supposition and remote evidence of plaintiff's cognitive abilities to discount uncontroverted and supported evidence of her current abilities was error. Cf. Frankl v. Shalala, 47 F.3d 935, 938-39 (8th Cir. 1995) (error to rely on remote evidence to determine RFC; RFC must reflect what work, if any, claimant is capable of performing at time of the hearing).

    2.   *Dr. Garriga*

In his written decision, the ALJ recognized Dr. Garriga as plaintiff's treating physician and determined not to accord Dr. Garriga's July 2009 medical source statement controlling weight:

I do not give Dr. Garriga's medical source

- 47 -

statement controlling weight because it is not
supported by his treatment notes and is
inconsistent with the rest of the medical
evidence. For example, there is no
explanation why the claimant would be limited
to sitting no more than 2 hours per day. In
addition, the doctor does not explain how the
relative mild objective findings from
examinations and imaging would support the
claimant's complaints of severe pain.
Finally, the doctor makes no mention of what
affect [sic] on the claimant's functioning
would occur if she was totally compliant with
her medications.

(Tr. 17.) (Internal citation to the record omitted.)[34]

As with Dr. Rosso's opinion evidence, the ALJ fails to explain what

weight he gave to Dr. Garriga's opinion. Although he gives reasons

for not according controlling weight to the opinion, he fails to

explain what weight he in fact gives the opinion and fails to give

good reasons for the weight so given, despite the Regulations'

requirement to do so. By explaining the weight given to

physicians' assessments, an ALJ both complies with the Regulations

and assists the Court in reviewing the decision. Willcockson v.

Astrue, 540 F.3d 878, 880 (8th Cir. 2008).

While the ALJ's reasons for not according *controlling*

weight to Dr. Garriga's opinion evidence are supported by

_____

[34]Notably, the ALJ cites only to Dr. Garriga's July 2009
statement and does not refer to the medical source statement
completed by Dr. Garriga in January 2008. Inasmuch as the
limitations expressed in the January 2008 statement are the same as
or more severe than those expressed in the July 2009 statement, the
undersigned presumes that the ALJ would have discounted Dr.
Garriga's January 2008 opinion for the same reasons set out above.

substantial evidence on the record, the ALJ's failure to identify the weight given to Dr. Garriga's evidence is especially significant here inasmuch as Dr. Garriga has been plaintiff's treating rheumatologist since 2003 and has observed firsthand the objective signs and symptoms of plaintiff's connective tissue disease, her responses to treatment, and her continued subjective complaints of severe pain.  To the extent some of Dr. Garriga's treatment notes indicate normal physical examination of joints and muscles, Dr. Garriga noted on two occasions that plaintiff's depression may exacerbate the severity of her symptoms.  The ALJ did not acknowledge this.  The ALJ's silence regarding the weight given to Dr. Garriga's opinion, coupled with other errors in the written decision, creates uncertainty and casts doubt upon the ALJ's rationale for denying plaintiff's claims.  See Willcockson, 540 F.3d at 879-80.  This uncertainty can be clarified on remand. Id. at 881.

B.   Credibility Determination

Plaintiff claims that the ALJ erred in his credibility assessment by failing to consider all factors relevant to making a credibility determination and by mischaracterizing certain evidence of record.

In determining the credibility of a claimant's subjective complaints, the ALJ must consider all evidence relating to the complaints, including the claimant's prior work record and third

party observations as to the claimant's daily activities; the duration, frequency and intensity of the symptoms; any precipitating and aggravating factors; the dosage, effectiveness and side effects of medication; and any functional restrictions. Halverson v. Astrue, 600 F.3d 922, 931 (8th Cir. 2010); Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984) (subsequent history omitted).  While an ALJ need not explicitly discuss each Polaski factor in his decision, he nevertheless must acknowledge and consider these factors before discounting a claimant's subjective complaints.  Wildman v. Astrue, 596 F.3d 959, 968 (8th Cir. 2010).

When, on judicial review, a plaintiff contends that the ALJ failed to properly consider her subjective complaints, "the duty of the court is to ascertain whether the ALJ considered all of the evidence relevant to the plaintiff's complaints . . . under the Polaski standards and whether the evidence so contradicts the plaintiff's subjective complaints that the ALJ could discount his or her testimony as not credible." Masterson v. Barnhart, 363 F.3d 731, 738-39 (8th Cir. 2004).  It is not enough that the record merely contain inconsistencies.  Instead, the ALJ must specifically demonstrate in his decision that he considered all of the evidence. Id. at 738; see also Cline v. Sullivan, 939 F.2d 560, 565 (8th Cir. 1991).  Where an ALJ explicitly considers the Polaski factors but then discredits a claimant's complaints for good reason, the decision should be upheld.  Hogan v. Apfel, 239 F.3d 958, 962 (8th

Cir. 2001).  The determination of a claimant's credibility is for the Commissioner, and not the Court, to make.  Tellez v. Barnhart, 403 F.3d 953, 957 (8th Cir. 2005); Pearsall, 274 F.3d at 1218.

In determining plaintiff's credibility in the instant cause, the ALJ noted the record to show plaintiff to have lupus, "but [that] she has not experienced an exacerbation since March 2007," and that, while hospitalized at that time, it was noted that plaintiff had been noncompliant with her medications in the past. (Tr. 16.)  While the ALJ properly noted that noncompliance with prescribed medical treatment is inconsistent with a disabling condition, the ALJ failed to consider the record evidence which showed plaintiff's purported noncompliance to be due in large part to the debilitating side effects caused by her medications. Indeed, a review of the record as a whole shows plaintiff to have suffered significant side effects from her medications, including nausea, headaches, chest pains, and dizziness, and that Dr. Garriga reported plaintiff to experience side effects from her medications. Dr. Garriga even determined on occasion to discontinue one or some of plaintiff's medications because of the side effects experienced by plaintiff.  The ALJ's decision, however, is devoid of any analysis of these documented side effects.

The ALJ also discounted plaintiff's subjective complaints relating to her depression, finding plaintiff not to have sought psychiatric treatment for the condition until June 2009, and that

plaintiff's diagnosis and treatment at that time was based "solely on her report[.]"  (Tr. 16.)  A review of the record as a whole, however, shows that plaintiff began exhibiting symptoms of depression in April 2005, that a depressive condition was suspected in January 2007, and that plaintiff was ultimately diagnosed with depression in May 2007.  The record also shows that despite being prescribed antidepressants since April 2005, plaintiff continued to exhibit symptoms of depression.  In addition, the ALJ's finding that plaintiff's psychiatric hospitalization was based solely on plaintiff's subjective reports ignores Dr. Garriga's continuous observations of plaintiff's tearfulness and depressive symptoms, Dr. Garriga's written recommendation that plaintiff seek psychiatric care and be admitted to a psychiatric hospital, and BJC Behavioral Health's recommendation that plaintiff be hospitalized given the severity of plaintiff's symptoms which included auditory and visual hallucinations.  Where alleged inconsistencies upon which an ALJ relies to discredit a claimant's subjective complaints are not supported by and indeed are contrary to the record, the ALJ's ultimate conclusion that the claimant's symptoms are less severe than she claims is undermined.  Baumgarten v. Chater, 75 F.3d 366, 368-69 (8th Cir. 1996).

Further, the ALJ's statement that the record failed to establish that plaintiff's depression would not be amenable to treatment and medication likewise ignores plaintiff's worsening

- 52 -

condition despite being prescribed antidepressant and anti-psychotic medications.  Although the ALJ did not have before him the Mental RFC Assessment completed by Counselor McBride in October 2009 wherein she stated that the several antidepressant and anti-psychotic medications taken by plaintiff did not help her condition, the ALJ nevertheless had before him numerous treatment notes which showed plaintiff's condition not to improve with medication and, indeed, that plaintiff continued to hear voices and have visual hallucinations despite her treatment with Risperdal.

Finally, the ALJ determined to discount plaintiff's credibility by finding that she appeared to exaggerate all of her limitations and appeared to be financially motivated to seek disability benefits.  Other than his blanket statement finding plaintiff to be exaggerating her symptoms, the ALJ cites to no evidence supporting this statement.  A review of the record shows, however, that plaintiff's treating physician specifically found on two separate occasions that plaintiff was not a malingerer.  As to plaintiff's financial motivation, the undersigned notes that the Eighth Circuit has stated that "all disability claimants are financially motivated to some extent" and that, therefore, financial motivation should not be dispositive in assessing a claimant's credibility.  Ramirez v. Barnhart, 292 F.3d 576, 581-82 n.4 (8th Cir. 2002).  Instead, "a claimant's financial motivation may contribute to an adverse credibility determination when other

- 53 -

factors cast doubt upon the claimant's credibility." Id. Because
the other factors upon which the ALJ relied to cast doubt upon
plaintiff's credibility are not supported by the record,
plaintiff's possible financial motivation in seeking benefits
cannot serve as a basis upon which to discredit her subjective
complaints.

In light of the above, it cannot be said that the ALJ
demonstrated in his written decision that he considered all of the
evidence relevant to plaintiff's complaints or that the evidence he
considered so contradicted plaintiff's subjective complaints that
her testimony could be discounted as not credible. Masterson, 363
F.3d at 738-39. Indeed, the ALJ's discounting of plaintiff's
complaints relating to her depression resulted in a credibility
analysis which failed to examine the possibility that plaintiff's
mental impairment aggravated her perception of pain. See Delrosa
v. Sullivan, 922 F.2d 480, 485-86 (8th Cir. 1991) (on remand, ALJ
advised to consider aggravating factor posed by possibility that
claimant's perception of pain is exacerbated by psychological
impairment). Accordingly, because the ALJ's decision fails to
demonstrate that he considered all of the evidence under the
standards set out in Polaski, this cause should be remanded to the
Commissioner for an appropriate analysis of plaintiff's credibility
in the manner required by and for the reasons discussed in Polaski.

C.    <u>RFC Assessment</u>

Where an ALJ errs in his determination to discredit a claimant's subjective complaints, the resulting RFC assessment is called into question inasmuch as it does not include all of the claimant's limitations. <u>See</u> <u>Holmstrom v. Massanari</u>, 270 F.3d 715, 722 (8th Cir. 2001).   Plaintiff also contends, however, that without proper consideration given to the opinion evidence rendered by Dr. Rosso and Dr. Garriga, there was no medical evidence upon which the ALJ could base his RFC determination.

Residual functional capacity is the most a claimant can do despite her physical or mental limitations. <u>Masterson</u>, 363 F.3d at 737.  The ALJ bears the primary responsibility for assessing a claimant's RFC based on all relevant, credible evidence in the record, including medical records, the observations of treating physicians and others, and the claimant's own description of her symptoms and limitations. <u>Goff v. Barnhart</u>, 421 F.3d 785, 793 (8th Cir. 2005); 20 C.F.R. §§ 404.1545(a), 416.945(a).  The RFC "'is a function-by-function assessment based upon all of the relevant evidence of an individual's ability to do work-related activities[.]'" <u>Roberson v. Astrue</u>, 481 F.3d 1020, 1023 (8th Cir. 2007) (quoting  S.S.R. 96-8p, 1996 WL 374184, at *3 (Soc. Sec. Admin. July 2, 1996)).  A claimant's RFC is a medical question, however, and some medical evidence must support the ALJ's RFC determination.  <u>Krogmeier v. Barnhart</u>, 294 F.3d 1019, 1023 (8th

Cir. 2002); Hutsell v. Massanari, 259 F.3d 707, 711-12 (8th Cir. 2001); Lauer v. Apfel, 245 F.3d 700, 703-04 (8th Cir. 2001). The ALJ is "required to consider at least some supporting evidence from a [medical professional]" and should therefore obtain medical evidence that addresses the claimant's ability to function in the workplace. Hutsell, 259 F.3d at 712 (internal quotation marks and citation omitted). An ALJ's RFC assessment which is not properly informed and supported by some medical evidence in the record cannot stand. Id. An RFC checklist completed by a non-treating, non-examining physician who has merely reviewed reports is not *medical* evidence as to how the claimant's impairments affect her current ability to function and thus cannot alone constitute substantial evidence to support an ALJ's RFC assessment. See Nevland v. Apfel, 204 F.3d 853, 858 (8th Cir. 2000); Nunn v. Heckler, 732 F.2d 645, 649 (8th Cir. 1984).

As with the weight accorded to the examining and treating physicians' opinions in this cause, the ALJ's decision is unclear as to what medical evidence he relied upon to determine plaintiff's RFC. Other than Dr. Garriga's opinion evidence and the RFC checklist completed by a non-examining consultant, there is no evidence describing plaintiff's physical functional limitations. Although the RFC checklist completed by the non-examining consultant is consistent with the ALJ's finding that plaintiff can engage in light work with limitations, the ALJ does not acknowledge

- 56 -

in his decision that he relied on such a checklist to support his determination.   Nor does the ALJ discuss whether or why he determined to accord such checklist opinion greater weight than that accorded to plaintiff's treating physician.

Inasmuch as the Commissioner will be given the opportunity upon remand to clarify the weight given to the opinion evidence of Dr. Rosso and Dr. Garriga, the Commissioner will likewise be given the opportunity to identify and clarify the medical evidence of record which supports his RFC determination. In addition, upon remand, the Commissioner will have the opportunity to review the additional treatment notes from Dr. Garriga and Counselor McBride's Mental RFC Assessment in the first instance and determine the appropriate weight to be given thereto.

Therefore, for all of the foregoing reasons, the Commissioner's adverse decision is not based upon substantial evidence on the record as a whole and the cause should be remanded to the Commissioner for further consideration.  Because the current record does not conclusively demonstrate that plaintiff is entitled to benefits, it would be inappropriate for the Court to award plaintiff such benefits at this time.

Accordingly,

**IT IS HEREBY ORDERED** that the decision of the Commissioner is **REVERSED** and this cause is remanded to the

Commissioner for further proceedings.

Judgment shall be entered accordingly.


_____
UNITED STATES MAGISTRATE JUDGE



Dated this  _7th_  day of September, 2011.